995 P.2d 735

James R. MONACO and Theresa Monaco, husband and wife, Plaintiffs/Appellees,

v.

HEALTHPARTNERS OF SOUTHERN ARIZONA, a corporate entity and dba Tucson Medical Center; Lalitha Ramanna, M.D., Defendants/Appellants.

No. 2 CA–CV 98–0218.

Court of Appeals of Arizona, Division 2, Department A.

June 30, 1999.

Reconsideration Denied Aug. 4, 1999.

Review Denied Feb. 8, 2000.

Law Offices of Ronald D. Mercaldo, Ltd.
by Ronald D. Mercaldo and Anthony J. Wiggins, and Kinerk, Beal, Schmidt & Dyer by

James H. Dyer and David W. Babcock, Tucson, Attorneys for Plaintiffs/Appellees.

Slutes, Sakrison, Grant, Hill & Rubin, P.C. by Tom Slutes and Michael B. Smith, Tucson, and Ulrich, Kessler & Anger, P.C. by Paul G. Ulrich and Donn G. Kessler, Phoenix, Attorneys for Defendants/Appellants.

## OPINION

DRUKE, Chief Judge.

¶ 1 Appellants HealthPartners of Southern Arizona, doing business as Tucson Medical Center (TMC), and Lalitha Ramanna, M.D., raise three issues in their appeal from a jury verdict and judgment in favor of appellees James and Theresa Monaco. Appellants contend the trial court erred in denying their motions for summary judgment, for directed verdict and judgment notwithstanding the verdict, and for a new trial or remittitur. Because we find no error in the trial court's rulings, we affirm.

¶ 2 We view the evidence in the light most favorable to sustaining the verdict and judgment. *Inch v. McPherson*, 176 Ariz. 132, 859 P.2d 755 (App.1992). In July 1995, James Monaco was referred to TMC by his doctor for a red blood cell test because of an elevated red blood cell count. The doctor wanted to determine whether the elevated count was due to the testosterone Monaco had been taking, a condition known as polycythemia, or whether his bone marrow was overproducing red blood cells, a condition known as polycythemia vera (PV). Monaco was seen by Dr. Ramanna at TMC, but the red blood cell test was not performed. Instead, he was erroneously given a five millicurie dose of phosphorus 32(P32), a radioactive substance used to treat PV, but not polycythemia. When his doctor told him a few days later that he had been incorrectly treated with P32, Monaco was shocked, frightened, and angry. After learning P32 could cause leukemia, Monaco could not stop thinking he might contract cancer and began having sleepless nights, often waking up in cold sweats. Monaco was never diagnosed with PV, and as a result of the P32 treatment, his risk of contracting leukemia increased from one out of 16,000 to three out of 100.

¶ 3 In September 1996, the Monacos filed a medical malpractice action against appellants. The pertinent part of the complaint alleged that James Monaco had, as a result of appellants' alleged negligence, "suffered serious and permanent psychological complications and potentially fatal physical complications from which he continues to suffer residual pain, suffering, emotional distress, [and] mental anguish." Before trial, appellants moved for summary judgment, arguing that they were entitled to judgment as a matter of law because Monaco had not suffered sufficient bodily harm to sustain a claim for negligent infliction of emotional distress, citing *Burns v. Jaquays Mining Corp.*, 156 Ariz. 375, 752 P.2d 28 (App.1988), and *DeStories v. City of Phoenix*, 154 Ariz. 604, 744 P.2d 705 (App.1987). The trial court denied the motion, citing *Quinn v. Turner*, 155 Ariz. 225, 745 P.2d 972 (App.1987), and the matter proceeded to trial. After the Monacos had presented their case, appellants moved for a directed verdict, now known as a motion for judgment as a matter of law (JMOL),[1] relying on the same argument and authority asserted in their motion for summary judgment. The court denied the motion and submitted the case to the jury. It returned a $1.5 million verdict for the Monacos. After the court entered judgment, appellants reasserted their motion for JMOL and, in the alternative, moved for a new trial or remittitur. After the court denied the motions, appellants brought this appeal. We have jurisdiction pursuant to A.R.S. § 12-2101.

## DENIAL OF MOTION FOR SUMMARY JUDGMENT

¶ 4 Appellants contend the trial court incorrectly denied their motion for summary judgment because, based on *Burns* and *DeStories*, they were entitled to judgment as a matter of law. The Monacos counter that the denial of summary judgment cannot be appealed after a final judgment in the same case, citing *Stewart v. Mutual of Omaha Insurance Co.*, 169 Ariz. 99, 817 P.2d 44

---

1. *See* Ariz. R. Civ. P. 50, 16 A.R.S.

(App.1991), and *Fleitz v. Van Westrienen,* 114 Ariz. 246, 560 P.2d 430 (App.1977). Appellants reply that *Hauskins v. McGillicuddy,* 175 Ariz. 42, 852 P.2d 1226 (App.1992), allows the denial of summary judgment to be reviewed on appeal if it presents only an issue of law. However, we need not resolve this dispute because, as noted above, appellants' basis for summary judgment (the absence of bodily harm) was reasserted in their subsequent motion for JMOL, which can be reviewed on appeal. *Shoen v. Shoen,* 191 Ariz. 64, 952 P.2d 302 (App.1997).

## DENIAL OF MOTION FOR JMOL

¶ 5 Relying primarily on *Burns, DeStories,* and the Restatement (Second) of Torts § 436A (1965), appellants contend the trial court improperly denied their motions for JMOL because there was no evidence Monaco suffered bodily harm to support a claim for negligent infliction of emotional distress. The Monacos agree *Burns, DeStories,* and Restatement § 436A apply, but maintain that the evidence supports their claim.

¶ 6 We review de novo a trial court's ruling on a motion for JMOL. *Gemstar, Ltd. v. Ernst & Young,* 185 Ariz. 493, 917 P.2d 222 (1996); *Shoen.* A trial court should grant a motion for JMOL only when the facts presented in support of a claim have so little probative value that reasonable people could not find for the claimant. *Shoen.* We view the evidence and all reasonable inferences from the evidence in the light most favorable to the nonmoving party. *Id.;* *Piper v. Bear Med. Sys., Inc.,* 180 Ariz. 170, 883 P.2d 407 (App.1993).

¶ 7 Arizona courts have long held that a claim for negligent infliction of emotional distress requires a showing of bodily harm. Our supreme court first enunciated this requirement in *Keck v. Jackson,* 122 Ariz. 114, 593 P.2d 668 (1979). There, the plaintiff's complaint alleged that she had "suffered severe emotional and physical distress from witnessing her mother's injuries and suffering" after the defendant's vehicle had collided with the parked vehicle occupied by her and her mother. *Id.* at 114, 593 P.2d at 668. Citing Restatement § 436A, the supreme

court reversed the trial court's dismissal of the plaintiff's emotional distress claim, holding that a person could recover "damages for shock or mental anguish at witnessing an injury to a third person," provided "the shock or mental anguish of the plaintiff [is] manifested as a physical injury." *Id.* at 115, 593 P.2d at 669. The court concluded that the plaintiff's complaint stated a cause of action because it alleged "that the plaintiff suffered severe emotional and physical distress because of witnessing the injuries to her mother and that the plaintiff thereby suffered accompanying physical injury." *Id.* at 116, 593 P.2d at 670.

¶ 8 Appellants argue that *Keck* and the subsequent cases of *Burns* and *DeStories* require that the emotional distress manifest itself as a physical injury, such as an ulcer, before a claim is stated. We disagree. Comment c to Restatement § 436A provides:

The rule stated in this Section applies to all forms of emotional disturbance, including temporary fright, nervous shock, nausea, grief, rage, and humiliation. The fact that these are accompanied by transitory, non-recurring physical phenomena, harmless in themselves ... does not make the actor liable when such phenomena are in themselves inconsequential and do not amount to any substantial bodily harm. On the other hand, long continued nausea or headaches may amount to physical illness, which is bodily harm; and even long continued mental disturbance, as for example in the case of repeated hysterical attacks, or mental aberration, may be classified by the courts as illness, notwithstanding their mental character.

The Arizona case law is in accord. *See Ball v. Prentice,* 162 Ariz. 150, 781 P.2d 628 (App. 1989) (plaintiff entitled to have jury decide whether nausea, loss of sleep, headaches, and emotional problems causally connected to automobile accident); *Quinn* (three-year-old boy's post-accident behavioral changes requiring treatment by psychologist for anxiety and by dentist for teeth grinding sufficient to defeat summary judgment). Moreover, *Keck* itself involved only severe emotional and physical distress, and *Burns,* relying on comment c to § 436A, determined that the

"headaches, acid indigestion, weeping, muscle spasms, depression and insomnia" some of the plaintiffs had suffered were "transitory physical phenomena" and, thus, "not the type of bodily harm which would sustain a cause of action for emotional distress." *Burns,* 156 Ariz. at 379, 752 P.2d .at 32. In sum, the Arizona cases and Restatement § 436A make clear that a physical injury, as well as a long-term physical illness or mental disturbance, constitutes sufficient bodily harm to support a claim of negligent infliction of emotional distress.

¶ 9 In this case, James Monaco testified that, since the P32 treatment, he believes "I am going to come down with [leukemia]" and even though "[p]eople say to me, just get it out of your head[, i]t does not work that way." He stated he has trouble sleeping, dreams frequently "about coming down with leukemia," and often walks "around the house from sometimes 2:00 in the morning till the sun comes up." He added that he does not have patience with his adult children and does not enjoy long visits by his grandchildren. Monaco also testified he had received counseling from Dr. Schwebel for his anger at Dr. Ramanna and was undergoing counseling with Dr. Crago for his anxiety.

¶ 10 Theresa Monaco corroborated her husband's testimony, stating:

> At night he is a wreck. He jumps all over the bed. I don't know what makes him do it. And on occasion I will go and hold him and say, maybe if I hold him, he won't jump like this. But after getting kicked and batted two or three times, I move over to my own side of the bed. And you wake up in the night and he's not there, he's walking around the house. Or you wake up and he's in the bed, soaking all like that. Grinds his teeth.

¶ 11 Dr. Crago, a psychologist, gave uncontradicted testimony that, after treating Monaco's anxiety for about six months, he had diagnosed the condition as post-traumatic stress disorder (PTSD). Dr. Crago stated that PTSD is "a widely accepted diagnosis" and described it as follows:

> [T]he defining characteristic [of PTSD] is something happens that is perceived as very threatening or life threatening, something traumatic. Something that makes you feel vulnerable or was very scary.
>
> Then what follows clinically, . . . people start having intrusive thoughts about this [trauma]. They cannot get it out of their mind. Usually the first thing they are aware of is they may have nightmares . . . or wake up in a sweat at night. They are just not sleeping well. . . .
>
> Other things that are very common are just a general sense of anxiety, maybe hypervigilant. . . . [T]heir nerves are frayed a bit. . . . [T]hey tend to withdraw. They are not themselves and so they maybe avoid their friends or family, become a little bit isolated. They may show symptoms of depression.

Dr. Crago testified that Monaco exhibited many of these same symptoms: "[H]e had intrusive thoughts, he had nightmares, wasn't sleeping well. He had depressive syndrome, wasn't doing well in the social life. He wasn't the same person with his family." Dr. Crago believed Monaco could learn to control his PTSD, but he would never "be cured of it." Finally, Dr. Crago stated that PTSD is "as real a medical condition as you can have, as broken legs or anything else."

¶ 12 Based on this record, we conclude that Monaco's P32 treatment resulted in substantial, long-term emotional disturbances sufficient to support the claim for negligent infliction of emotional distress. The emotional disturbances were not "temporary," "transitory," "inconsequential," or "harmless in themselves." Restatement § 436A cmt. c. Accordingly, the trial court properly denied appellants' motions for JMOL.

## MOTION FOR NEW TRIAL OR REMITTITUR

¶ 13 After entry of judgment, appellants timely moved for a new trial or remittitur pursuant to Rule 59, Ariz. R. Civ. P., 16 A.R.S. They argued to the trial court, as they do on appeal, that the $1.5 million verdict was excessive, the result of passion or prejudice, and unsupported by the evidence or the law. Appellants claim the jury returned an excessive verdict because the trial court pre-

cluded them from responding to a juror's question about remedial measures they had taken after Monaco's P32 treatment and because the Monacos' attorney improperly told the jurors in closing argument to send a message to TMC. We review the trial court's denial of a motion for new trial or remittitur for a clear abuse of discretion. *Delbridge v. Salt River Project Agric. Improvement & Power Dist.*, 182 Ariz. 46, 893 P.2d 46 (App. 1994).

### Subsequent Remedial Measures

¶14 At the conclusion of Dr. Ramanna's direct examination, the trial court received this question from a juror: "What changes (if any) have been made in the procedures of the TMC Nuclear Medicine Dept. since this incident?" After the court excused the jury, appellants' counsel stated, "I am going to ask it. I have no secrets." When the Monacos' attorney objected on the basis of relevance, the court reviewed Rule 407, Ariz. R. Evid., 17A A.R.S., and determined that none of its exceptions for the admission of subsequent remedial measures applied. In response, appellants' counsel remarked: "Well, as long as [the Monacos' attorney] doesn't, in closing argument, stand up and say, let's send a message to T.M.C. . . . [W]e've already got the message and we've changed our procedures." After the Monacos' attorney reasserted his relevance objection, the court sustained the objection and ruled that "[t]he sending-the-message argument is stricken."

¶15 Appellants argue that the evidence of their subsequent remedial measures was "admissible to avoid any inadvertent award of punitive damages," relying on *Baroldy v. Ortho Pharmaceutical Corp.*, 157 Ariz. 574, 760 P.2d 574 (App.1988), and *Readenour v. Marion Power Shovel*, 149 Ariz. 442, 719 P.2d 1058 (1986). Appellants' reliance on these cases is misplaced. Neither stands for the proposition that Rule 407 allows a party to introduce evidence of subsequent remedial measures to deter or prevent an award of punitive damages. In *Baroldy*, such evidence was admitted for impeachment pur-

poses, which Rule 407 expressly allows, and in *Readenour*, it was admitted to prove, rather than preclude, punitive damages. "[The evidence] was relevant to the punitive damage argument based upon defendant's failure to take safety measures with regard to the particular shovel in question after it discovered the danger and realized what could be done to prevent accidents from occurring. . . . The large punitive damage award may well be attributable to effective use of the evidence in question." *Readenour*, 149 Ariz. at 448, 719 P.2d at 1064. And, unlike *Readenour*, the Monacos were not seeking punitive damages; therefore, the trial court correctly ruled that evidence of appellants' subsequent remedial measures was irrelevant. Such evidence would not have made "the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ariz. R. Evid. 401. See also 2 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 407.04[1][a] (Joseph M. McLaughlin ed., 2d ed.1999) (admissibility of subsequent remedial measures on issues other than culpability governed by relevancy rules). Finally, by specifically prohibiting a "sending-the-message argument," the trial court adequately addressed appellants' concern that the Monacos' attorney might make such an argument to the jury.

### Closing Argument

¶16 Appellants contend the Monacos' attorney violated the court's prohibition by arguing as follows to the jury.[2]

Dr. Ramanna said she felt terrible about [what happened]. She said she breached her duty to her patient. Mr. Slutes still wants to argue, well, she is looking at hindsight. She feels bad, so she really did not do anything wrong. I am sorry, it was wrong. It was wrong. Mr. Monaco suffered.

Tucson Medical Center is not what it used to be. Tucson Medical Center is owned by something called Healthpart-

---

**2.** To provide context, we have included additional portions of the closing argument that were not set forth in appellants' opening brief.

ners. Healthpartners manages it, Healthpartners owns it. Dr. Ramanna works for them. Healthpartners is responsible for the acts of its employees, and those employees are all the way from Elizabeth Ulmer [office associate] to Mary Schemmer [manager of Nuclear Medicine] to Dr. Ramanna, to people in Risk Management, to everybody else over there. That's where the fault lies. Some tighter controls need to be exercised. Needed to be exercised over there.

Now, Dr. Ramanna was brought in as the head of the Department, and Dr. Ramanna—I am not saying Dr. Ramanna is not a qualified physician, I happen to think she is quite a nice person. But let me suggest to you, if you look at Dr. Ramanna's resume, you are looking at someone who is very, very, very ·busy, and very, very well traveled. And I would suggest to you, and I would suggest to Healthpartners, that some of the energy that is used in creating or developing a resume like this could be put into putting in controls and putting in safeguards and precautions at the Nuclear Medicine Department where the patients come to be treated. That is where the energy needs to be put in.

On appeal, appellants assert that this portion of the closing argument told the jury "it should send a message to TMC to improve its procedures." Taken as a whole, however, we believe the argument was intended to convince the jury that appellants were negligent or at "fault" in treating Monaco with P32 and that they could have prevented the "wrong" with proper "controls" and "safeguards." Moreover, even if we assume the argument implicitly urged the jury to send TMC a message, appellants failed to object to the argument and have therefore waived the issue on appeal. *See Grant v. Arizona Public Service Co.*, 133 Ariz. 434, 652 P.2d 507 (1982); *Liberatore v. Thompson*, 157 Ariz. 612, 760 P.2d 612 (App.1988); *Maxwell v. Aetna Life Ins. Co.*, 143 Ariz. 205, 693 P.2d 348 (App.1984). Prompt objection allows the

trial court to "impose restraints upon counsel once it appears that argument is proceeding past legitimate boundaries." *Grant*, 133 Ariz. at 453, 652 P.2d at 526.

¶ 17 Appellants nonetheless claim they challenged the propriety of the argument at the first opportunity in their motion for new trial. The record belies this claim. Appellants' counsel readily objected to an earlier portion of the closing argument by the Monacos' attorney and promptly stated two objections to his rebuttal argument. Consistent with *Grant*, the trial court cautioned the jury appropriately on the first two objections and sustained the third.

¶ 18 Appellants also claim, citing *Grant* and *Maxwell*, that they did not waive the issue because the misconduct was so serious it could not be corrected by a jury admonition and that the misconduct probably influenced the verdict. In support of their position, appellants point to the size of the verdict and the post-trial statements some jurors made to the media.[3] We agree that waiver does not apply when serious misconduct occurs. *See Schmerfeld v. Hendry*, 74 Ariz. 159, 245 P.2d 420 (1952); *City of Prescott v. Sumid*, 30 Ariz. 347, 247 P. 122 (1926); *Liberatore*. Nevertheless, we have already determined that the argument in question was not improper; thus, no misconduct occurred here. Also, even if we assume misconduct did occur, the trial court's denial of appellants' motion for new trial necessarily implies that the court did not find the misconduct of such magnitude that it actually influenced the verdict. "We do not reverse that discretionary, factual finding unless the record clearly establishes that the trial court was incorrect." *Grant*, 133 Ariz. at 455, 652 P.2d at 528. The record here does not clearly demonstrate reversible error.

**Remittitur**

¶ 19 Appellants maintain that the trial court erred in denying a remittitur, claiming the $1.5 million verdict is excessive.

---

3. We decline to consider these media statements, as we presume the trial court did, because they were inadmissible under Rule 606(b), Ariz. R. Evid. We reject appellants' contention that the closing argument in question constituted "extraneous" prejudicial information that was improperly brought to the jury's attention. Extraneous prejudicial information generally refers to matters not of record. *See Kirby v. Rosell*, 133 Ariz. 42, 648 P.2d 1048 (App.1982).

Appellants' sole basis for their claim is that the jury "wanted to send a message to TMC to change its procedures" and thus "used the wrong legal standard to award damages." Having already resolved this issue against appellants, we need not discuss it further. Moreover, we defer to the trial court's ruling on appellants' motion for remittitur because its ruling is "nearly always ... more soundly based than ours can be." *Creamer v. Troiano*, 108 Ariz. 573, 575, 503 P.2d 794, 796 (1972).

¶ 20 We therefore affirm the verdict and judgment entered in favor of the Monacos and against appellants.

CONCURRING: J. WILLIAM BRAMMER, JR., Judge, and JOSEPH W. HOWARD, Judge.