158 P.3d 877

**Kenneth W. FELDER, Plaintiff/Appellee,**

v.

**PHYSIOTHERAPY ASSOCIATES,**
**Defendant/Appellant.**

**No. 1 CA–CV 05–0719.**

Court of Appeals of Arizona,
Division 1, Department C.

May 22, 2007.

Copple, Boehm, & Murphy, P.C. By Scott E. Boehm, Phoenix, and Kelly Law Offices, By Timothy F. Kelly, Michael P. Massucci, Crown Point, Indiana, Attorneys for Plaintiff/Appellee.

Mariscal, Weeks, Mcintyre & Friedlander, P.A. By Timothy J. Thomason, Michael J. Plati, Phoenix, Attorneys for Defendant/Appellant.

## OPINION

IRVINE, Presiding Judge.

¶ 1 Physiotherapy Associates appeals from the trial court's rulings, judgment, and award of damages to Appellee Kenneth Felder. We find that the trial court properly allowed the jury to determine Felder's lost earning ca-

pacity as a professional baseball player. Therefore, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶ 2 In 1992, the Milwaukee Brewers drafted Felder in the first round of the Major League draft. He signed a contract to play in the Brewers' minor league system. From 1992 through 1996, Felder progressed in his career as the Brewers promoted him from the rookie league to the Class A level, AA level, and up to the AAA level.

¶ 3 In 1996, Felder injured his elbow. Although the injury affected his throwing and hitting, he was twice named Player of the Week when he played in the AAA level in New Orleans. He healed during the offseason, but tore an elbow ligament during spring training in 1997.

¶ 4 Felder had surgery to repair the ligament and recuperated for the rest of the 1997 season. The Brewers sent Felder to Physiotherapy for physical rehabilitation and paid his rehabilitation costs. Physiotherapy is a national physical rehabilitation company with a number of major and minor league baseball players among its clientele.

¶ 5 About seven-and-a-half months into his rehabilitation, Felder's elbow was improving. He passed a Brewers' physical administered at Physiotherapy in January 1998. In February 1998, shortly before the accident at issue here, the Brewers signed Felder to a salary addendum contract for the 1998 minor league season.

¶ 6 After conferring with the Brewers and Felder's surgeon, one of Physiotherapy's physical therapists, Keith Kocher, decided that it was time for Felder to begin hitting. Eventually, at Physiotherapy's Tempe location, Felder began hitting balls in the batting cage. Physiotherapy's training records did not indicate that Felder was restricted to practicing either off of tees or a pitching machine. He took batting practice at least three times a week, during each of his thera-

py sessions. Witnesses testified that the batting cage was not designed or maintained for batting practice. The architect who designed Physiotherapy's facility testified that the batting cage was there to allow rehabilitating pitchers to throw balls; it was not designed, intended, or safe for batting. Former Physiotherapy employee John Fierro testified that Physiotherapy had not established a maintenance schedule for the pitching mound or the batter's box. Moreover, there were no records to show that Physiotherapy had purchased dirt and maintenance supplies for the area.[1]

¶ 7 On February 25, 1998 Felder arrived at Physiotherapy for his scheduled rehabilitation. He warmed up, stretched and practiced throwing. Kocher then told Felder to take some batting practice.[2]

¶ 8 Felder hit a ball that ricocheted off of a concrete lip in the batter's box, bounced back up at him, and struck his left eye. His eye bled. He felt nauseous, dizzy and was in pain. For the next two days, he coughed up blood.

¶ 9 Dr. Alan Gordon, Felder's ophthalmologist and retina specialist, testified that Felder sustained a fracture of the orbital bone below his eye, a rupture of his cornea, subretinal hemorrhaging, and bleeding into his sinus cavity. Irremediable retinal damage left him with a blind spot in the middle of his vision. He also suffers from blurry vision that worsens in bright light, and he has constant headaches.

¶ 10 The injury initially left Felder with 20/400 vision in his left eye, but it eventually improved to 20/40 plus. Felder has less than a 1% risk of completely losing his vision in that eye due to subretinal neovascularization, the growth of new blood vessels that can leak fluid under the retina.

¶ 11 About a week after he injured his eye, Felder reported to the Brewers' spring training camp. He failed his physical because of

---

1. Kocher disagreed with the testimony about the design and maintenance of the batting cage. We view the evidence in the light most favorable to sustaining the judgment. *Paul Schoonover, Inc., v. Ram Constr., Inc.,* 129 Ariz. 204, 205, 630 P.2d 27, 28 (1981).

2. Kocher's and Felder's testimony differed on this point.

his eye injury and the team sent him away. He returned to the Brewers' training facility two more times. Each time, they told him to leave. The Brewers subsequently released him from his contract. Felder filed suit against Physiotherapy in August 1998.

¶ 12 At the first trial in 2000, players' agent Slade Mead was Felder's expert witness on the issue of damages. Although he opined that Felder would have made it to the major leagues and as to the potential length of Felder's major league career, Mead conceded that his opinion was speculative. Nevertheless, the jury found in favor of Felder and determined his damages to be $8,000,000. The jury concluded that Felder was 25% at fault for the accident, so the award was reduced to $6,000,000.

¶ 13 On appeal, we reversed and remanded for several reasons. First, the trial court erred by only instructing the jury on general negligence and not on negligence based on traditional premises liability law. Second, the evidence Felder presented in support of his claim for lost earnings from major league baseball was too speculative. We required Felder to present stronger evidence on remand. We stated:

> [Felder] may be able to present stronger evidence on remand regarding his chances of playing major league baseball and his projected earnings as a major leaguer. We are not holding that a minor league player can never prove a loss of earning capacity as a probable major league player. But for the guidance of the court on remand, it is our conclusion that the evidence presented by Felder in the first trial was too speculative to support damages for lost earning capacity as a major leaguer.

The Arizona Supreme Court denied Felder's Petition for Review.

¶ 14 During jury selection at the second trial, Physiotherapy struck S.R., a Hispanic woman. Felder challenged that strike as being race based in violation of S.R.'s equal protection rights as articulated in *Batson v.*

*Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Physiotherapy contended that it struck S.R. because she testified that she had a friend who suffered a knee injury and could no longer play sports. Physiotherapy felt that this friendship could exert an undue influence over S.R.

¶ 15 In response to a question during voir dire, S.R. said: "I had a friend in junior high [school] that had to have several surgeries done on her knee. She played basketball. She couldn't play after that." S.R. stated that this experience would not cause her to identify with either party in the case.

¶ 16 Finding no race-neutral explanation for the strike, the trial court granted Felder's *Batson* challenge and reinstated S.R. to the jury.[3]

¶ 17 At the second trial, Al Goldis testified as an expert witness for Felder about whether Felder would have played in the major leagues and the expected length of his career. At the time of trial, Goldis was the special assistant to the general manager of the New York Mets and had previously worked for several major league teams. He had twenty-seven years of experience in drafting, scouting and developing players for major league baseball teams. Goldis stated that he was not paid to testify.

¶ 18 Goldis reviewed the Brewers' pre-draft scouting reports and minor league coaching reports about Felder. He noted that the Brewers had promoted Felder all the way up from the rookie league to the AAA level, and that his next step would have been the major leagues. Despite some conflicting reports from the minor league coaches regarding Felder's ability, Goldis testified to a reasonable degree of certainty that not only would Felder have made it to the major leagues, but that he would have been an impact player.[4]

¶ 19 Goldis also compared Felder to major league players who hit fifteen home runs or more per season from 1981–1990. Goldis

---

3. Ultimately, S.R. did not participate in deliberations. She was permitted to leave the jury for health-related reasons after Felder's opening statement.

4. An impact player is defined as a player who is expected to hit home runs and who other teams would pitch around. Teams recruit impact players because baseball fans pay to see home run hitters.

opined that Felder had more power than Frank Thomas, a player that Goldis had drafted. Goldis stated that he could make comparisons between Felder and Thomas to a reasonable degree of certainty. Given that Thomas had been playing for approximately seventeen years as of the date of trial, Goldis testified that Felder's career would have lasted between twelve and fifteen years.

¶ 20 In considering Physiotherapy's motion for partial summary judgment on the lost earnings claim, the court made the following statements.

I don't have any problem with Mr. Goldis coming in as the more proficient expert on baseball talent, less of a speculative witness on the issue of baseball talent.... I think Goldis is a better person to address the issues of concern expressed by the Court of Appeals on the issue of likelihood or unlikelihood of making it into the pros.

¶ 21 The jury heard that Felder received some of the benefits usually afforded to major league players. When Felder injured his elbow in 1997 he was treated by a doctor and trainer who were assigned to work with major league players. The Brewers paid for the surgery on Felder's elbow and for his rehabilitation at Physiotherapy. Although it would have cost the Brewers less to just release Felder than it did to keep him on the AAA team and to pay his sports rehabilitation costs, they did not terminate their relationship with Felder until his eye injury rendered him permanently incapable of playing professional baseball.

¶ 22 Felder also had Mead testify again about economic damages and the range of player salaries. Mead testified that he knew who Felder was even though he was not Felder's agent, because as a first-round draft choice, Felder was a "very high-profile baseball player back when ... he was being drafted and coming out of [Florida State University]."

¶ 23 In calculating Felder's expected earnings, Mead selected two comparable minor league players, Jeremy Burnitz and Geoff Jenkins, who moved on to the major leagues. Like Felder, Burnitz and Jenkins were college outfielders, first-round draft picks, power hitters, and played for the Brewers. Mead also presented evidence of how Felder's minor league performance differed from Burnitz and Jenkins. Mead valued a seven year career for Felder at $27,790,440.

¶ 24 In response, Physiotherapy presented two experts who testified that Felder did not have a bright future in baseball. Eddie Epstein worked for several teams in major league baseball and evaluates players' performance by statistical calculation. Steve Phillips was formerly General Manager of the New York Mets. Both testified that Felder's chances of making the major leagues were slim.

¶ 25 Physiotherapy also sought to introduce the testimony of former Diamondbacks' executive Ralph Nelson. Nelson was in charge of the Diamondbacks' expansion draft in 1997. Physiotherapy offered Nelson's testimony to rebut Mead's assertion that the reason no team signed Felder after he was "outrighted," meaning that he was removed from the Brewers' 40–man roster, was because in 1997 it was common knowledge within the baseball industry that Felder was injured.[5] Physiotherapy sought to introduce Nelson's testimony because he would have testified that the Diamondbacks chose not to sign Felder for reasons unrelated to any injuries that he may have had.

¶ 26 The trial court excluded Nelson's testimony because Phillips did not say that he relied on Nelson's testimony to formulate his opinions, the scope of Nelson's testimony pertained to a collateral matter and Nelson's

5. Major league baseball uses a 25–man roster and a 40–man roster. The 25–man roster lists the players who are on the major league team. The 40–man roster includes everyone on the 25–man roster, plus 15 players whom the major league team wishes to "protect" from being drafted by other teams. Players on the 40–man roster are members of the Players' Association, which is the players' union. Association members are governed by the terms of the Collective Bargaining Agreement. The Agreement's terms set broad guidelines which establish how a player is treated by a major league franchise with regard to travel, accommodations, and salary structure. Felder was on the 40–man roster repeatedly from October or November 1994 until March 14, 1997.

testimony might rely on hearsay rather than his own observations. In addition, the court remarked that Nelson's proposed testimony about the Diamondbacks' reasons for not signing Felder could produce testimony that would be duplicative of Phillips' testimony. *See* Ariz. R. Civ. P. 26(b)(4)(D).

¶ 27 Physiotherapy later filed a motion for judgment as a matter of law on Felder's claim of negligence predicated on premises liability, a motion for partial judgment as a matter of law as to whether Felder was entitled to damages because of the risk of future neovascularization and a motion for partial judgment as a matter of law on Felder's claim of lost income as a major league baseball player.

¶ 28 The court denied the motion for judgment as a matter of law which alleged that Felder was a trespasser. The court also prohibited Felder from seeking special damages for future medical care or for damages resulting from any macular degeneration but permitted Felder to seek general damages for the present and future continuing anxiety about the injury and the possibility that he could lose his sight.

¶ 29 The court also denied the motion for partial judgment as a matter of law regarding Felder's claim of lost earnings from major league baseball. In considering the motion, the trial court remarked that while Felder had not already made it to the major leagues, the "only remaining chance that [he] had to make [it into] Major League baseball was taken away from him."

¶ 30 The court concluded that there was sufficient evidence presented by the close of Felder's case that would allow reasonable jurors to differ about whether Felder would have made it into the major leagues, the length of his major league career and the range of his compensation. Regarding the unique role of the jury, the court remarked, "juries are allowed to find in the middle and to look at all of the evidence and don't have to go with either the plaintiff or the defendants or with management or the player." The court declined to substitute its judgment for the jury's, and added "[t]here is sufficient evidence to allow the jury to consider [Feld-er] as a potential Major League baseball player."

¶ 31 The court added that the jury could find that Felder could have remained in the minor leagues as an organizational player for years, or that he could have made it to the major leagues but would never receive more than the minimum annual salary, or some other result. In any case, the jury could reasonably find "the fact of damages" from Felder's injury. The court stated that should the jury determine that Felder would have made it to the major leagues, "we have statistics and information with respect to the longevity of players once they reach it ... based upon age and statistics." Thus, the court denied the motion as to Felder's lost earnings claim.

¶ 32 The second jury found $7,000,000 in damages, with Felder 30% at fault, resulting in an award of $4,900,000. Physiotherapy timely filed its motion for a new trial or remittitur. The court denied that motion. Physiotherapy timely appealed.

## DISCUSSION

¶ 33 Physiotherapy raises several issues on appeal. First, it argues that the trial court erred by denying its motion for judgment as a matter of law on Felder's lost earnings claim. Second, it contends that the trial court erred by not granting its motion for judgment as a matter of law on the anxiety from the risk of neovascularization claim. Third, Physiotherapy challenges several of the trial court's evidentiary rulings. Fourth, it argues that the trial court did not comply with the rule that only one expert may testify for each issue. *See* Ariz. R. Civ. P. 26(b)(4)(D). Fifth, Physiotherapy challenges the court's grant of Felder's *Batson* motion and alleges that this error deprived it of one of its peremptory strikes. We discuss each issue below.

## I. LOST EARNINGS CLAIM

¶ 34 Physiotherapy contends that the trial court erred by denying its motion for judgment as a matter of law regarding Felder's lost earnings claim. Physiotherapy asserts that the evidence of whether Felder would

have reached the major leagues, the length of his career and the calculation of his earnings was just as speculative as the evidence Felder had presented in the first trial.

¶ 35 Felder rejects Physiotherapy's characterization that his evidence was speculative and argues that the expert testimony he presented at the second trial was sufficient to prove his damages to a reasonable certainty.

¶ 36 We review the trial court's ruling on a motion for judgment as a matter of law de novo. *Monaco v. HealthPartners of S. Ariz.*, 196 Ariz. 299, 302, ¶ 6, 995 P.2d 735, 738 (App.1999). Judgment as a matter of law lies where "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Ariz. R. Civ. P. 50(a). In other words, the trial court properly grants the motion "if the facts produced in support of the claim or defense have so little probative value, given the quantum of evidence required, that reasonable people could not agree with the conclusion advanced by the proponent of the claim or defense." *Orme Sch. v. Reeves*, 166 Ariz. 301, 309, 802 P.2d 1000, 1008 (1990).

¶ 37 Physiotherapy argues that the evidence fails to provide a sufficient evidentiary basis for a jury to find that Felder has a claim for lost earnings. Specifically, Physiotherapy contends that the trial court erred as a matter of law by failing to find that the evidence was speculative and therefore insufficient to support a claim for lost earnings as a matter of law.

¶ 38 "Past and future lost wages are an appropriate measure of damages under Arizona law." *Lewis v. N.J. Riebe Enters., Inc.*, 170 Ariz. 384, 397, 825 P.2d 5, 18 (1992); *see also Bryant v. Silverman*, 146 Ariz. 41, 47, 703 P.2d 1190, 1196 (1985) ("Thus, Arizona allows unlimited recovery for actual damages, expenses for past and prospective medical care, past and prospective pain and suffering, lost earnings, and diminished earning capacity."). "Once the right to damages is established, uncertainty as to the amount of damages does not preclude recovery." *Lewis*, 170 Ariz. at 397, 825 P.2d at 18. This is simply a recognition that doubts as to the extent of the injury should be re-solved in favor of the innocent plaintiff and against the wrongdoer. But it cannot dispel the requirement that the plaintiff's evidence provide some basis for estimating his loss. This court stated in *McNutt Oil & Refining Co. v. D'Ascoli*, 79 Ariz. 28, 281 P.2d 966 (1955), that "conjecture or speculation" cannot provide the basis for an award of damages, and said in *Martin v. LaFon*, [55 Ariz. 196, 100 P.2d 182 (1940)] that the evidence must make "an approximately accurate estimate" possible. *Gilmore v. Cohen*, 95 Ariz. 34, 36, 386 P.2d 81, 82 (1963). The evidence required will depend "on the individual circumstances of each case and, although absolute certainty is not required, the jury must be guided by some rational standard." *Short v. Riley*, 150 Ariz. 583, 586, 724 P.2d 1252, 1255 (App. 1986).

¶ 39 Arizona law on this point is consistent with the rule set out in the Restatement. The comment to the Restatement of Torts (Second) § 912 (1979) provides:

> It is desirable that responsibility for harm should not be imposed until it has been proved with reasonable certainty that the harm resulted from the wrongful conduct of the person charged. It is desirable, also, that there be definiteness of proof of the amount of damage as far as is reasonably possible. It is even more desirable, however, that an injured person not be deprived of substantial compensation merely because he cannot prove with complete certainty the extent of harm he has suffered.
>
> . . . .
>
> The requirements vary with the possibilities for making a reasonably exact estimate of the amount of harm measured in terms of money.

*Id.* at cmt. a. Thus, fairly compensating the injured person in a personal injury case may require trusting the jury to fairly evaluate evidence that is inherently uncertain but is the best evidence available.

¶ 40 This trust in the jury is consistent with our supreme court's recognition that a central task for juries is resolving disputes over difficult and conflicting evi-

dence. Uncertainty alone does not justify taking away a party's right to have evidence heard by a jury. With regard to damages, the court has stated:

> The difficult problem of quantifying general damages should not have prevented the courts from awarding such damages *if* in fact an injury had occurred. It is the genius of the common law that difficult damage questions are left to juries. *See Meyer v. Ricklick,* 99 Ariz. 355, 357–58, 409 P.2d 280, 281–82 (1965) (damage amount in personal injury action is peculiarly within jury's province, and the "law does not fix precise rules for the measure of damages but leaves their assessment to a jury's good sense and unbiased judgment")....

*Walker v. Mart,* 164 Ariz. 37, 41, 790 P.2d 735, 739 (1990); *see also Logerquist v. McVey,* 196 Ariz. 470, 491, ¶ 65, 1 P.3d 113, 134 (2000) (retaining *Frye* rule because "evidentiary testing should come from the adversary system and be decided by the jury"). The basic issue in this case is whether the trial court properly relied on the "good sense and unbiased judgment" of the jury to evaluate Felder's claim for damages related to his loss of earning capacity as a professional baseball player. *Meyer,* 99 Ariz. at 358, 409 P.2d at 282.

¶ 41 The jury found Physiotherapy liable for Felder's injury. Moreover, the evidence plainly showed that Felder's career as a professional baseball player ended as a direct result of the injury. Consequently, the *fact* of damage was proven. Physiotherapy argues that Felder must prove he would have been promoted to the major leagues, in effect arguing that the fact of damage is damage to his major league career. We disagree with this characterization. Felder was a professional baseball player at the time he was injured. The injury to his eye ended his playing career. Being promoted to the major leagues would not have been a different career, but simply a significant advancement in his existing career.

¶ 42 We recognize that simply dreaming of a career as a professional athlete is not enough to create an issue of fact appropriate for a jury. *See Sheppard v.*

*Crow–Barker–Paul No. 1 Ltd. P'ship,* 192 Ariz. 539, 548–49, ¶¶ 48–52, 968 P.2d 612, 621–22 (App.1998) (affirming jury instruction that refused to let jury speculate on star high school basketball player's possible earnings during a professional career). As the comment to the Restatement recognized, however, it is desirable that "an injured person not be deprived of substantial compensation merely because he cannot prove with complete certainty the extent of harm he has suffered." Restatement (Second) of Torts, § 912, cmt. a. In analyzing where to draw the line between certainty and speculation, the Tennessee Court of Appeals stated:

> Impairment of earning capacity is not necessarily measured by an injured person's employment or salary at the time of the injury. It is not uncommon for an injured person to assert that an injury has caused him or her to abandon plans to change employment, to obtain additional education or training, or to otherwise advance a career. In the face of such an assertion, the trier of fact must distinguish between persons with only vague hopes of entering a new profession and those with the demonstrated ability and intent to do so.

*Overstreet v. Shoney's, Inc.,* 4 S.W.3d 694, 704–05 (Tenn.App.1999) (internal citation omitted) (affirming damage award to nurse relating to future career advancements).

¶ 43 Felder had more than a vague hope of a successful career as a professional baseball player. Although the parties disagree as to his major league prospects, it is undisputed that Felder had advanced within professional baseball and at the time of his injury he had been signed to another AAA contract. He had demonstrated his ability to be a professional baseball player. His injury plainly took away his chance to continue and advance as a player.

¶ 44 The issue, therefore, becomes what degree of reasonable certainty is required to set the amount of Felder's damages. As noted, the degree of certainty that is reasonably required varies depending on the circumstances of each case, and, indeed, on the cause of action asserted. "In an action for personal injuries, the law does not

**164**

fix precise rules for the measure of damages but leaves their assessment to a jury's good sense and unbiased judgment." *Meyer*, 99 Ariz. at 358, 409 P.2d at 282. This rule includes claims for loss of earnings resulting from personal injuries. *Id.*

¶ 45 In contrast, "[d]amages for diminution in future earning power or capacity are not recoverable in an action for breach of an employment contract." *Lindsey v. Univ. of Ariz.*, 157 Ariz. 48, 54, 754 P.2d 1152, 1158 (App.1987). Our courts have decided that "[i]n an action for breach of contract, the employee is not permitted recovery for injury to his reputation because the computation of damages is too speculative and the damage cannot reasonably be presumed to be within the contemplation of the parties when they entered into the contract." *Id.* In effect, our courts have decided that in breach of employment contract cases it is reasonable to require almost complete certainty as reflected in the actual terms of the contract and the expectations of the parties to the contract.[6]

¶ 46 In breach of contract cases in which lost profits are claimed as damages the issue becomes more complicated. Indeed, the line between the fact of damage and the amount of damage may be blurred when lost profits are at issue. Although discussed in terms of *amount* of lost profits, many cases actually focus on whether a plaintiff has presented sufficient proof of the *fact* of lost profits. For example, in *Rancho Pescado* the plaintiff sought to recover lost profits from a commercial catfish farm. *Rancho Pescado, Inc. v. Nw. Mut. Life Ins. Co.*, 140 Ariz. 174, 680 P.2d 1235 (App.1984). This court affirmed the trial court's finding that the plaintiff had failed to show that he would have been successful at the business. *Id.* at 186, 680 P.2d at 1247. In effect, the court found that the plaintiff failed to prove the fact of lost profits. *Id.; see also Coury Bros. Ranches, Inc. v. Ellsworth*, 103 Ariz. 515, 520–21, 446 P.2d 458, 463–64 (1968) (finding evidence failed to show that breach of contract caused losses).

¶ 47 Once the fact of lost profits is established in a breach of contract action, our courts have not been as strict about the amount. As quoted above, where it can be proven that profits were lost, "doubts as to the extent of the injury should be resolved in favor of the innocent plaintiff and against the wrongdoer." *Gilmore*, 95 Ariz. at 36, 386 P.2d at 82. That being said, "[t]he requirement of 'reasonable certainty' in establishing the amount of damages applies with added force where a loss of future profits is alleged. This is so because such loss is capable of proof more closely approximating 'mathematical precision.' " *Id.* at 36, 386 P.2d at 82–83 (internal citation omitted). Reasonable certainty as to the amount of lost profits can be shown by books of account, records of previous transactions or tax returns, *id.* at 36, 386 P.2d at 83, or the "profit history from a similar business operated by the plaintiff at a different location." *Rancho Pescado*, 140 Ariz. at 184, 680 P.2d at 1245. Disagreements as to the evidence used to establish the amount of damages will go to the "weight of the evidence." *Short*, 150 Ariz. at 586, 724 P.2d at 1255; *see also Logerquist*, 196 Ariz. at 488, ¶ 52, 1 P.3d at 131 ("Questions about the accuracy and reliability of a witness' factual basis, data, and methods go to the weight and credibility of the witness' testimony and are questions of fact.... It is the jury's function to determine accuracy, weight or credibility.").

¶ 48 From these authorities we conclude that when determining what constitutes "reasonable certainty" as to the amount of damages in a personal injury action, the key consideration must be what is "reasonable" under the circumstances of the particular case. Some cases will simply not be conducive to a high degree of certainty because the future itself is uncertain. This does not, however, deprive an injured plaintiff of a remedy. A plaintiff may still claim damages in an amount supported by the best evidence available and the essential consideration is that "the jury must be guided by

---

6. In light of the bright-line rule articulated in *Lindsey* that reduced earning power is not recoverable in a breach of contract action, that opinion's analysis of the speculative nature of income from athletic endorsements was dicta and provides little assistance to us in determining what "reasonable certainty" means in this personal injury case.

some rational standard." *Short,* 150 Ariz. at 586, 724 P.2d at 1255.

¶ 49 Applying this standard, we do not believe it would be reasonable in a personal injury action to require a professional athlete to prove with complete certainty how successful he will be at his chosen profession. There will always be uncertainty concerning the athlete's physical performance and success in competition. For damage to a sports career, the evidence reasonably available will generally be what was presented at trial in this case—qualified expert testimony concerning the athlete's prospects, statistics showing past performance, and comparative data concerning other athletes. We need not detail all of the evidence concerning Felder's career. Suffice it to say that the jury learned in detail about his batting averages, fielding performances, and injuries between 1992 and 1998. The jury was provided with evaluations from minor league coaches and opinions from several experts with major league player development experience. The jury also heard about the economics of baseball compensation, including how long a professional's career might be and what similar players were being paid.

¶ 50 In ruling on whether the lost earning capacity issue should go to the jury, the trial court found that reasonable people could disagree about Felder's prospects and therefore allowed the issue to go to the jury. We agree with that conclusion. No one can say with complete certainty whether Felder would, or would not, have been promoted to the major leagues or how long he might have played there. We can say, however, as the jury did, that his eye injury prevented him from having that chance. Under these circumstances, the amount of his damages for being deprived of that chance was for the jury to decide.

¶ 51 Physiotherapy argues that allowing lost earning capacity to go to the jury is contrary to our previous memorandum decision in this case, in which we stated that

Felder needed "stronger" evidence to prevail. Physiotherapy states that the facts concerning Felder's career were the same in both trials, and merely adding Goldis as an expert witness did not make the case stronger. We disagree. We did not hold in our previous ruling that the only way Felder could claim damages is by producing evidence that showed it to be completely certain that he would be promoted to the major leagues. We simply opined that Felder needed more than an expert who had no background in actually hiring players for teams and who admittedly speculated about Felder's major league prospects. The testimony of Goldis filled that gap. The function of an expert is to "provide testimony on subjects that are beyond the common sense, experience and education of the average juror." *Adams v. Amore,* 182 Ariz. 253, 255, 895 P.2d 1016, 1018 (App.1994) (quoting *State v. Lindsey,* 149 Ariz. 472, 475, 720 P.2d 73, 76 (1986)). As we explained above, a jury was entitled to consider the evidence that was reasonably available to evaluate Felder's prospects, i.e., data about past performance and expert testimony about future prospects. Goldis was able to provide information from the management's point of view about those future prospects. We find no error in the trial court's determining that our previous ruling was satisfied.[7]

## II. ANXIETY CLAIM

¶ 52 Physiotherapy alleges that the trial court erred when it failed to grant judgment as a matter of law on Felder's claim for anxiety generated by the risk of future neovascularization. Felder responds that he has a permanent risk of neovascularization and acknowledged to the jury that the risk is less than 1%. As stated above, we review the trial court's ruling on a motion for judgment as a matter of law de novo. *Monaco,* 196 Ariz. at 302, ¶ 6, 995 P.2d at 738.

¶ 53 Physiotherapy argues that there was insufficient evidence to support the anxiety claim. In support of its argument, Physiotherapy cites *DeStories v. City of Phoenix,*

7. Physiotherapy also points to this court's citations in our earlier decision to *Lindsey* and *Rancho Pescado.* As discussed above, those cases are distinguishable on the precise issue presented here.

154 Ariz. 604, 605, 744 P.2d 705, 706 (App. 1987), in which the plaintiff sought to recover damages for emotional harm absent any physical injury, based on plaintiff's increased risk of contracting asbestosis or lung cancer.

¶ 54 Because Felder has suffered physical injuries, including an orbital bone fracture, ruptured retinal tissue, subretinal hemorrhaging, and other injuries to his eye, we find *DeStories* inapposite. *DeStories* cites the principle from Prosser and Keaton's *The Law of Torts*, that "there can be no recovery for mental disturbance unless physical injury, illness or other physical consequence accompany it, or physical harm develops as a result of the plaintiff's emotional distress." *Id.* at 608, 744 P.2d at 709 (citing W. Page Keaton, et al., *Prosser and Keaton on the Law of Torts* § 54 at 361–63 (5th ed.1984)). Because Felder suffered serious physical harm, he is able to recover for his anxiety over his less than 1% chance of neovascularization. We conclude that the trial court did not err.

## III. EVIDENTIARY RULINGS

¶ 55 Generally, we review challenges to the court's admission or exclusion of evidence for an abuse of discretion. *Yauch v. S. Pac. Transp. Co.*, 198 Ariz. 394, 399, ¶ 10, 10 P.3d 1181, 1186 (App.2000). If the evidentiary ruling is predicated on a question of law, we review that ruling de novo. *Id.*

¶ 56 Physiotherapy asserts that the court erred by excluding its outright data evidence. Physiotherapy's expert, Steve Phillips, former general manager for the Mets, compiled data from 1993–2004 regarding over 400 "outrighted" players who were cut from the 40–man roster. This evidence proposed to show that only 21.3% of outrighted players advance to the major leagues and only 3.4% of outrighted players remained in the major leagues for more than three years. Physiotherapy argued that the evidence was relevant to rebutting the claims of Felder's experts regarding his baseball career and earnings.

¶ 57 The trial court expressed concern over Physiotherapy's motion to admit the evidence shortly before the trial began. Because this data was untimely disclosed, the court pointed out that Felder would not have had a chance to review and analyze the underlying data which supported the data compilation.

¶ 58 Felder stated the grounds for his objection to the evidence:

> [This is a] statistical analysis which talks about odds.... [A] GM does not draft or refuse to draft a player based on the odds.... The players in the chart don't have the same skill sets as [Felder], don't play the same position as [Felder]. Aren't all first-round draft picks .... some of these players play[ed] college ball, some high school and some neither. These comparisons are ... irrelevant, immaterial and ... improper.

¶ 59 The court explained its concerns about admitting the chart:

> I have no way of knowing that—that it accurately summarizes that data regularly made and kept in the course of baseball business. I'm not going to take the time from somebody from Major League baseball to come here and tell me that it does.... I have a question as to whether it's relevant as opposed to a specific analysis, that is, tools, his skills, his abilities, his age, his longevity in the minors, his injuries have been analyzed like you would analyze any other player as opposed to in mass.... [W]e have to look at [Felder] as an individual. And the only way to do that is to compare him to the players that are most similar to him as opposed to a wide universe of people dropped from the 40–man roster.... [Physiotherapy's] witness has not done a player by player comparison.... I don't think we ought to get into the statistics because they're not meaningful. There's no way that the jury can use or interpret those statistics.

¶ 60 Physiotherapy argued: "We've chosen [to] compare him to other outrighted players. We believe those are similarly situated players. And if you don't allow it, you substitute your judgment for the jurors'."

¶ 61 The court excluded the outright data compilation because it essentially presented the odds of an outrighted player advancing to the major leagues. Nevertheless, the court

allowed Physiotherapy's expert, Steve Phillips, to testify about "the significance of being dropped from the 40–man roster" and that few outrighted players have ever advanced to the major leagues.

¶ 62 We cannot conclude that the trial court abused its discretion. The outright data comparison included players from different positions. Sixty-three percent of the players on the chart were pitchers. Given the trial court's considerable discretion and Phillips' testimony, we find no error.

¶ 63 Physiotherapy next asserts that the court erred by excluding the testimony of former Diamondbacks' executive Ralph Nelson. Physiotherapy intended for Nelson's testimony to rebut Felder's experts' claim that the only reason the Diamondbacks did not draft Felder was because he was injured. Felder contends that Physiotherapy wanted Nelson to testify as a third expert witness, in contravention to the rules.

¶ 64 The court clearly stated its rationale on the record in support of excluding the testimony. Physiotherapy's expert, Phillips, did not indicate that he was relying on Nelson's testimony in order to formulate his opinions. Further, Nelson's testimony would have addressed the collateral matter of the Diamondbacks' rationale in choosing not to hire Felder. We cannot conclude that the court abused its discretion.

## IV. DUPLICATIVE EXPERT TESTIMONY

¶ 65 Physiotherapy next contends that the trial court erred by allowing Felder to introduce evidence of the statistics of "comparable major league players" through Felder's expert, Mead. Physiotherapy construed this testimony as duplicative of Goldis' testimony regarding Felder's baseball career, and thus violative of Arizona Civil Procedure Rule 26(b)(4)(D).

¶ 66 We review the trial court's ruling on a discovery issue for an abuse of discretion. *Twin City Fire Ins. Co. v. Burke*, 204 Ariz. 251, 253, ¶ 10, 63 P.3d 282, 284 (2003). Arizona Rule of Civil Procedure 26(b)(4)(D) states that in all cases "each side shall presumptively be entitled to only one

independent expert on an issue, except upon a showing of good cause." Reasoning that the evidence was relevant to a quantification of damages, the trial court admitted it.

¶ 67 Physiotherapy's precise objection concerns Mead's comparison of Felder's statistics to those of two other minor league players who advanced to the major leagues. Physiotherapy argues that the admission of this evidence rendered Mead's testimony a "second expert opinion on Felder's major league prospects." Physiotherapy asserts that this evidence invites the jury to conclude that the similarity between Felder's statistics and two major league players means that Felder would have made the major leagues as well. Thus, Physiotherapy argues that Mead's testimony addressed Goldis' issue: whether or not . Felder would have had a career in the major leagues.

¶ 68 Felder responds that the court's ruling complied with the rule because each expert testified about a discrete issue. Goldis testified about Felder's chances of making it into the major leagues and the anticipated length of his major league career. Mead testified about the range of minor and major league salaries. Further, Felder regards both experts' use of statistics in their comparisons as non-dispositive because they used the statistics for different purposes. Mead used the statistics for economic purposes while Goldis used them to opine about Felder's baseball prospects.

¶ 69 The question is whether Goldis and Mead testified about separate issues so that the trial court's ruling complies with Rule 26(b)(4)(D). "Where an issue cuts across several professional disciplines, the court should be liberal in allowing expansion of the limitation upon experts established in the rule." Ariz. R. Civ. P. 26(b) cmt. (Committee comment to 1991 amendment). Thus, defining the scope of an issue is left to the trial court's reasonable discretion.

¶ 70 Having reviewed the record, we conclude that the court did not abuse its discretion. Goldis confined his testimony to Felder's baseball career. Mead testified as a sports agent regarding Felder's likely earnings based on Goldis' estimate that Felder

would play for ten to fourteen years. Although each expert discussed other players, that alone does not render the testimony duplicative.

## V. *BATSON* RULING & PEREMPTORY CHALLENGES

¶ 71 Physiotherapy asserts that the trial court improperly sustained Felder's *Batson* challenge regarding Physiotherapy's peremptory strike against S.R., a Hispanic woman.

¶ 72 In reviewing a *Batson* ruling, we defer to the trial court's factual findings unless they are clearly erroneous, meaning that they are unsupported by substantial evidence. *State v. Lucas*, 199 Ariz. 366, 368, ¶ 6, 18 P.3d 160, 162 (App.2001); *Visco v. Universal Refuse Removal Co.*, 11 Ariz.App. 73, 75, 462 P.2d 90, 92 (1969) (defining clearly erroneous standard). We review questions of law de novo. *Lucas*, 199 Ariz. at 368, ¶ 6, 18 P.3d at 162.

¶ 73 *Batson's* prohibition against race-based peremptory challenges applies to civil cases. *Edmonson v. Leesville Concrete Co., Inc.*, 500 U.S. 614, 631, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991). In a *Batson* challenge, the objecting party must make a prima facie showing of purposeful discrimination. *Purkett v. Elem*, 514 U.S. 765, 767, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995); *Batson*, 476 U.S. at 93–94, 106 S.Ct. 1712. The trial court should consider all of the relevant circumstances in its evaluation of whether the party has made the required showing. *Batson*, 476 U.S. at 96–97, 106 S.Ct. 1712.

¶ 74 Once the moving party makes that showing, the opposing party must offer a race neutral explanation. *Purkett*, 514 U.S. at 767, 115 S.Ct. 1769. "Unless a discriminatory intent is inherent in the [nonmoving party's] explanation, the reason offered will be deemed race-neutral." *Id.* at 768, 115 S.Ct. 1769. The reason need not be logical or persuasive; its sole requirement is that it does not violate equal protection. *Id.* at 769, 115 S.Ct. 1769.

¶ 75 The trial court must then determine whether the objecting party "proved purposeful racial discrimination." *Id.* at 767,

115 S.Ct. 1769. The trial court may then consider the reason for the peremptory strike. *Id.* at 768, 115 S.Ct. 1769. "[I]mplausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." *Id.*

¶ 76 Felder supported his initial prima facie showing of purposeful discrimination against minority women on the panel. Physiotherapy's first three strikes were against S.R., who is a Hispanic woman, an African–American woman and another Hispanic woman. S.R. hardly spoke throughout voir dire. The trial court found that the strike of S.R., but not the strikes against the other two women, violated *Batson*.

¶ 77 Once Felder made his prima facie showing, Physiotherapy had the chance to offer a race-neutral reason for the strike. Physiotherapy contended that it struck S.R. because it believed that S.R.'s injured friend, who lost her ability to participate in sports when she was in junior high school, could exert an undue influence over her in this case.

¶ 78 Having heard Physiotherapy's rationale for that strike, the trial court had to determine whether Felder had proved a claim of purposeful discrimination against S.R. The trial court was not persuaded by Physiotherapy's explanation. Even considering S.R.'s responses and conduct during voir dire, the trial court concluded that there was no race neutral reason to strike her from the jury. The trial court granted the *Batson* challenge and reinstated S.R. to the jury. We find no error. The trial court acted within its discretion in finding Physiotherapy's explanation inadequate.

¶ 79 Physiotherapy also contends that the trial court's *Batson* ruling denied its fundamental right to exercise an equal number of peremptory challenges. It argues that it should have been allowed an additional challenge when the trial court found one of its challenges to be invalid.

¶ 80 Physiotherapy did not raise this issue in the trial court before the jury was empanelled and the remaining venire members were excused. Its failure to timely raise this issue below waives it on appeal. *State v.*

*Harris,* 175 Ariz. 64, 67, 852 P.2d 1248, 1251 (App.1993).

## CONCLUSION

¶ 81 For the reasons discussed above, we affirm the judgment.

CONCURRING: JOHN C. GEMMILL and HARRIETT CHAVEZ, JJ.[8]

---

**8.** The Honorable Harriett Chavez, Judge of the Maricopa County Superior Court, was authorized by the Chief Justice of the Arizona Supreme Court to participate in the disposition of this appeal pursuant to the Arizona Constitution, Article 6, Section 3, and A.R.S. §§ 12–145 to –147 (2003).