IN THE COURT OF APPEALS
STATE OF ARIZONA
DIVISION TWO

FILED BY CLERK

MAY 27 2010

COURT OF APPEALS
DIVISION TWO

| | | |
|---|---|---|
| CAROL SALICA, the surviving wife of Louis Salica, individually and on behalf of statutory beneficiaries, | ) ) ) ) | |
| | ) | 2 CA-CV 2009-0153 |
| Plaintiff/Appellee, | ) | DEPARTMENT B |
| | ) | |
| v. | ) | O P I N I O N |
| | ) | |
| TUCSON HEART HOSPITAL – CARONDELET, L.L.C., an Arizona corporation, | ) ) ) ) | |
| | ) | |
| Defendant/Appellant. | ) ) | |

APPEAL FROM THE SUPERIOR COURT OF PIMA COUNTY

Cause No. C-20072703

Honorable Virginia C. Kelly, Judge

AFFIRMED

Piccarreta Davis PC
  By Barry M. Davis and Amy Hernandez                                      Tucson
                                                    Attorneys for Plaintiff/Appellee

Humphrey & Petersen, P.C.
  By Marshall Humphrey III and Andrew J. Petersen                          Tucson

    and

Cooper & Scully, P.C.
  By John A. Scully                                                   Dallas, Texas
                                                    Attorneys for Defendant/Appellant

E C K E R S T R OM, Presiding Judge.

¶1        This appeal by the defendant Tucson Heart Hospital – Carondelet, L.L.C., arises from a wrongful death action filed by Carol Salica, Louis Salica's widow.  After a twelve-day trial, a jury found Tucson Heart and other parties had negligently caused Salica's death.  The jury determined Tucson Heart was sixty percent responsible and found it liable for damages totaling $600,000.[1]  On appeal, Tucson Heart argues there was insufficient evidence that its negligence caused Salica's death and urges this court to reverse the trial court's denial of its motion for judgment as a matter of law.  For the reasons set forth below, we affirm.

**Factual and Procedural Background**

¶2        "We view the evidence and reasonable inferences therefrom in the light most favorable to upholding the jury's verdict."  *Acuna v. Kroack*, 212 Ariz. 104, ¶ 3, 128 P.3d 221, 223 (App. 2006).  At approximately 4:15 a.m. on September 26, 2005, fifty-year-old Louis Salica went to Tucson Heart's emergency room complaining of chest pains and shortness of breath.  After being examined, tested, and treated by emergency room physicians, he was admitted to the hospital around noon in stable condition.  The emergency room doctors had given him differential diagnoses of acute coronary syndrome (ACS), congestive heart failure (CHF), pneumonia, and hypoxia, or insufficient oxygen.

---

[1]The jury found Salica's cardiologist, Dr. James Myer, and the corporation with which he was affiliated liable for forty percent of the damages.  However, those defendants satisfied the judgments against them and are not parties to the appeal.

¶3    While in the hospital that day, Salica was examined by an internist and a pulmonologist. The internist believed that, although Salica had some type of "cardiac component" to his illness, he was suffering primarily from pneumonia. The pulmonologist who later examined Salica and reviewed his records disagreed. Having detected a murmur in the mitral valve of Salica's heart, the pulmonologist believed Salica was most likely suffering from a mitral-valve disease that was causing cardiac decompensation. Salica was in stable condition when the pulmonologist examined him at 5:00 p.m., but the doctor characterized him as a "really sick guy" and expected him to be cared for by a cardiologist.

¶4    Salica's own cardiologist and attending physician, Dr. James Myer, did not examine Salica in the hospital until 9:00 p.m. Myer had been informed of Salica's status over twelve hours earlier and originally had planned to visit him in the emergency room. When Myer saw him, Salica was receiving supplemental oxygen, and Myer ordered that he be given Lasix to reduce the fluid in his lungs and thereby ease his breathing. Because it is a diuretic, Lasix also increases a patient's urine output.

¶5    During his examination of Salica, Myer detected mitral-valve regurgitation and arranged for his partner, Dr. Charles Katzenberg, to perform a transesophageal echocardiogram (TEE) the next morning to identify the defect more specifically. Following Myer's visit with Salica, the on-call physician covering for Myer, Dr. Edward Byrne-Quinn, would have received any overnight calls made to Myer regarding Salica.

¶6    That night, while Salica was in the care of registered nurse Diane LeBlanc, his health deteriorated. His urine production was less than expected, indicating the Lasix

3

was not having its intended effect, and his oxygen saturation consistently was below the minimum level of ninety percent, even though he had been placed on a non-rebreathing device and was receiving the maximum amount of supplemental oxygen possible without intubation. Nurse LeBlanc consulted both her charge nurse and a respiratory therapist about Salica's condition during this period. Yet she did not alert a physician about Salica's status until approximately 6:00 the next morning during a telephone conference initiated by Dr. Katzenberg.

¶7     The plaintiff's expert witness, Nurse Halina Orawiec, testified LeBlanc's failure to call a physician between 9:00 p.m. and 6:00 a.m. fell below the standard of care for registered nurses in several respects. Specifically, LeBlanc failed to report that Salica had been placed on a non-rebreathing device at around 12:30 a.m. on September 27 without improvement;[2] she failed to report that his oxygen levels were consistently below the minimum level, despite the fact that he was receiving the maximum possible amount of supplemental oxygen;[3] and she failed to report Salica's poor response to Lasix, which was evident two hours after it had been administered.

---

[2]Nurse LeBlanc suggested and Salica's wife testified that Salica was already on the non-rebreathing device when Dr. Myer was with him at 9:00 p.m. However, Myer refuted this testimony, and the record from the respiratory therapist who placed Salica on the device indicated it occurred several hours later. Viewing the evidence in the light most favorable to sustaining the verdicts, we accept the latter version of events for purposes of this appeal. *See Warne Invs., Ltd. v. Higgins*, 219 Ariz. 186, ¶ 15, 195 P.3d 645, 650 (App. 2008).

[3]LeBlanc admitted at trial that Salica's oxygen saturation was below the minimum level several times between 1:00 and 3:00 a.m.

4

¶8        Dr. Mark Perlroth, the plaintiff's expert-witness cardiologist, testified that the standard of care for a cardiologist upon receiving a report about Salica's status during LeBlanc's shift would have called for prompt action. This included admitting Salica to the intensive-care unit (ICU), intubating him, performing a TEE, inserting an intra-aortic balloon, increasing his medications, and consulting with a cardiothoracic surgeon.[4] Another expert witness, Dr. Andrew Wechsler, testified that the lack of surgical intervention during LeBlanc's shift, resulting in "hours of progression of the underlying heart failure and difficulty in getting oxygen into the body in adequate amounts," had meaningfully decreased Salica's chance of survival.

¶9        The following morning, the pulmonologist who examined Salica after Nurse LeBlanc's shift had ended found Salica was "significantly worse than when [he] left him the day before." The internist who previously had examined Salica ordered him to the ICU at approximately 8:20 a.m. Dr. Katzenberg arrived at the hospital around 10:40 a.m., requested a consultation with a cardiothoracic surgeon about thirty minutes later, and intubated Salica shortly thereafter. By noon, the TEE revealed Salica had

---

[4]At oral argument, Tucson Heart claimed Dr. Perlroth did not testify about the standard of care for a cardiologist upon receiving an overnight call from the nurse; rather, his testimony only pertained to the treatment and interventions Dr. Myer should have undertaken when he examined Salica around 9:00 p.m. Although Perlroth mentioned this window of time in his testimony, he also clarified that a reasonably prudent cardiologist would have implemented these measures upon learning "the most dramatic information about how [Salica] was doing," namely that his oxygen saturation levels had dropped into the seventy-percent range and that his respiration rate had risen to thirty-six breaths per minute when breathing room air. This "very critical point" came when Salica was being placed on the non-rebreathing device and momentarily had to breathe without supplemental oxygen. And despite the conflicting evidence about when this occurred, we accept for purposes of this appeal that he was placed on the device after midnight, during Nurse LeBlanc's shift, but well after Myer's visit had ended.

suffered a papillary muscle rupture that would require surgery. In preparation for the surgery, Dr. Myer inserted an intra-aortic balloon pump. Doctors successfully repaired Salica's mitral valve that day, but he ultimately died from complications and infections resulting from the surgery. Dr. Paul Auwaerter, an infectious-disease specialist, testified Salica's susceptibility to those complications was a consequence of his fragile, significantly deteriorated condition at the time of the surgery.

¶10　　At the close of the plaintiff's evidence, Tucson Heart moved for judgment as a matter of law (JMOL) pursuant to Rule 50(a), Ariz. R. Civ. P., arguing the plaintiff had failed to prove that the negligence of its employee, Nurse LeBlanc, had caused Salica's death. The trial court denied the motion. Tucson Heart renewed its motion under Rule 50(b) after the entry of judgment, and the court again denied the motion. This appeal followed.

### Discussion

¶11　　Tucson Heart challenges the denial of its Rule 50 motion, an issue we review de novo. *See Felder v. Physiotherapy Assocs.*, 215 Ariz. 154, ¶ 36, 158 P.3d 877, 885 (App. 2007). "A motion for JMOL should be granted 'if the facts produced in support of the claim or defense have so little probative value, given the quantum of evidence required, that reasonable people could not agree with the conclusion advanced by the proponent of the claim or defense.'" *A Tumbling-T Ranches v. Flood Control Dist. of Maricopa County*, 222 Ariz. 515, ¶ 14, 217 P.3d 1220, 1229 (App. 2009), *quoting Orme Sch. v. Reeves,* 166 Ariz. 301, 309, 802 P.2d 1000, 1008 (1990); *see also* Ariz. R. Civ. P. 50(a)(1). When analyzing this issue, "we 'review the evidence in a light

6

most favorable to upholding the jury verdict' and will affirm 'if any substantial evidence exists permitting reasonable persons to reach such a result.'" *Acuna v. Kroack*, 212 Ariz. 104, ¶ 24, 128 P.3d 221, 228 (App. 2006), *quoting Hutcherson v. City of Phoenix*, 192 Ariz. 51, ¶ 13, 961 P.2d 449, 451 (1998).

¶12        As part of her wrongful death cause of action brought pursuant to A.R.S. § 12-611,[5] the plaintiff had to establish medical malpractice in accordance with A.R.S. §§ 12-561(2), 12-562(A), and 12-563.  Pursuant to § 12-563, she was required to prove that Salica's health care providers failed to comply with the accepted standard of care and that "[s]uch failure was a proximate cause of the injury."  The sole issue raised in this appeal is whether the evidence presented was legally sufficient to establish causation. Specifically, the question is whether that evidence allowed the jury to conclude that the actions of Tucson Heart's employee, Nurse LeBlanc, proximately caused Salica's death.

¶13        A "proximate cause" is defined as "that which, in a natural and continuous sequence, unbroken by any efficient intervening cause, produces an injury, and without

---

[5]The statute reads:

> When death of a person is caused by wrongful act, neglect or default, and the act, neglect or default is such as would, if death had not ensued, have entitled the party injured to maintain an action to recover damages in respect thereof, then, and in every such case, the person who or the corporation which would have been liable if death had not ensued shall be liable to an action for damages, notwithstanding the death of the person injured, and although the death was caused under such circumstances as amount in law to murder in the first or second degree or manslaughter.

7

which the injury would not have occurred."[6] *Robertson v. Sixpence Inns of Am., Inc.*, 163 Ariz. 539, 546, 789 P.2d 1040, 1047 (1990). This definition includes the element of causation in fact. Jefferson L. Lankford & Douglas A. Blaze, *The Law of Negligence in Arizona* § 4.2 at 48 (1992).

¶14 However, when multiple tortfeasors are alleged to have created an indivisible injury and each defendant's causal role is potentially indeterminable, such causal uncertainty will not prevent a plaintiff from recovering altogether. *E.g.*, *Piner v. Superior Court*, 192 Ariz. 182, ¶¶ 3-4, 18, 26, 962 P.2d 909, 910-11, 913-14, 915-16 (1998) (sequential car accidents; extent of damage caused by each unknown); *Holtz v. Holder*, 101 Ariz. 247, 248-49, 251, 418 P.2d 584, 585-86, 588 (1966) (sequential car accidents; cause in fact and extent of damages caused by each defendant unknown); *Summers v. Tice*, 199 P.2d 1, 3-4, 5 (Cal. 1948) (eye injury from one of two shotgun blasts; cause in fact unknown). The test under such circumstances is whether the defendant's actions were "a substantial factor" in producing the injury. *See Barrett v. Harris*, 207 Ariz. 374, ¶¶ 24, 26, 86 P.3d 954, 960-61 (App. 2004); 65 C.J.S. *Negligence* § 216 (2010) (in concurrent negligence cases, "the proper cause in fact inquiry is whether the conduct in question was a substantial factor in bringing about the accident").

---

[6]An "intervening cause" is defined as "an independent cause that intervenes between defendant's original negligent act or omission and the final result and is necessary in bringing about that result." *Robertson v. Sixpence Inns of Am., Inc.*, 163 Ariz. 539, 546, 789 P.2d 1040, 1047 (1990). An intervening cause qualifies as a "superseding cause," and thereby relieves a defendant of liability for his original negligence, only if the "intervening force was unforeseeable and may be described, with the benefit of hindsight, as extraordinary." *Id.*

¶15 Arizona has adopted the "substantial factor" test from the Restatement (Second) of Torts §§ 431, 433, and 435 (1965), in order to prevent inequities and serve the remedial aims of tort law. *See Piner*, 192 Ariz. 182, ¶ 28, 962 P.2d at 916; *Holtz*, 101 Ariz. at 251, 418 P.2d at 588; *Barrett*, 207 Ariz. 374, ¶¶ 22-24, 86 P.3d at 960-61; Restatement § 433A cmt. a. To avoid the "'unfairness of denying the injured person redress simply because he cannot prove how much damage each [tortfeasor] did, when it is certain that between them they did all,'" tortfeasors are left to apportion damages among themselves when causation is potentially indeterminable.[7] *Piner*, 192 Ariz. 182, n.3, 962 P.2d at 914 n.3, *quoting Summers*, 199 P.2d at 3. This approach is in keeping with the modern common law, which evolved to place any financial loss upon culpable defendants "whe[n] negligence on the part of both defendants [wa]s clear, and it [wa]s only the issue of causation which [wa]s in doubt." *Id*. ¶ 11, *quoting* W. Page Keeton et al., *Prosser & Keeton on the Law of Torts* § 41, at 271 (5th ed. 1984). A plaintiff therefore will be allowed to recover if he or she shows multiple defendants "contributed to the final result," in which case "the burden of proof on apportionment is on them." *Id*. ¶ 30.

¶16 "Causation is generally a question of fact for the jury unless reasonable persons could not conclude that a plaintiff had proved this element." *Barrett*, 207 Ariz. 374, ¶ 12, 86 P.3d at 958. A party may prove proximate causation by presenting facts

---

[7]Apportionment of fault is not called for when a plaintiff suffers separate injuries and liability can be apportioned based only on causation. *See* A.R.S. § 12-2506(B) (requiring calculation of percentage of fault only for those who "contributed to the alleged injury").

from which a causal relationship may be inferred, but the party cannot leave causation to the jury's speculation. *Robertson*, 163 Ariz. at 546, 789 P.2d at 1047. "[U]nless a causal relationship is readily apparent to the trier of fact," expert medical testimony normally is required to establish proximate cause in a medical negligence case. *Gregg v. Nat'l Med. Health Care Servs., Inc.*, 145 Ariz. 51, 54, 699 P.2d 925, 928 (App. 1985).

¶17 Here, LeBlanc's negligence in failing to alert a physician to Salica's deteriorating status is not disputed on appeal. And, based upon the evidence presented below, the jury reasonably could have concluded that LeBlanc's failure to act contributed to Salica's worsened and weakened condition and was a substantial factor causing his death. As Dr. Perlroth testified, there were a number of medical interventions that should have been performed promptly had a physician been alerted to Salica's worsening condition, including intubation, performing a TEE, inserting an intra-aortic pump, and consulting a cardiothoracic surgeon. By the time these measures were taken, Salica's oxygen saturation had declined drastically; he was in shock; and his chances of survival, according to Dr. Wechsler, had fallen from over ninety percent to approximately twenty percent. The jury reasonably could have inferred, given the testimony of Dr. Auwaerter, that, had the various parties responsible for Salica's medical care not acted negligently, Salica would not have been as susceptible to infection and would not have died from his surgery.

¶18 Indeed, the present case is factually similar to *Estate of Reinen v. N. Ariz. Orthopedics, Ltd.*, 198 Ariz. 283, 9 P.3d 314 (2000). There, the plaintiff estate alleged that the nurse responsible for Reinen's care had breached her duty by failing to obtain a

doctor for him and by not informing her supervisor of his deteriorating condition during her overnight shift. *Id.* ¶¶ 1-4. The estate also claimed the on-call orthopedist was negligent in failing to seek a consultation from the on-call internist and codefendant, Dr. Thomas Henry. *Id.* ¶¶ 1, 4. Henry was a defendant in the case due to his failure to examine Reinen or to make sufficient inquiries when contacted about his status. *Id.* ¶¶ 2, 4. At trial, Henry testified "he would not have altered [the] course of treatment if called on to do an internal medicine consultation or take over the patient's care." *Id.* ¶ 6. The trial court consequently granted Henry's motion for a directed verdict on the ground that evidence of causation was lacking. *Id.* ¶¶ 6-7. The court also concluded there could be no proximate-cause finding against either the orthopedist or the nurse, even assuming they had been negligent in their care, and it thus dismissed the case against both the orthopedist and the hospital. *Id.*

¶19 Our supreme court reversed the trial court's rulings and remanded the case for a new trial. *Id.* ¶ 28. As the court noted, the plaintiff's expert witness established that, under the circumstances of the case, the standard of care for an internist required that Henry personally examine the patient; had this occurred, the necessary treatments then could have been instituted, giving the patient a seventy percent chance of avoiding permanent injury. *Id.* ¶ 10. Because this expert testimony "provided evidence of a breach of the standard of care . . . and a causal relationship to Reinen's injuries," the court concluded dismissing Henry from the case was erroneous. *Id.* The *Reinen* court similarly concluded the trial court had erred in dismissing the orthopedist and the hospital

11

from the case, as the testimony of the plaintiff's expert was sufficient to show both a breach of duty and the defendants' "causal relation to Reinen's injuries." *Id.* ¶¶ 13-15.

¶20 None of Tucson Heart's arguments alters our conclusion that the evidence presented below was sufficient to allow the jury to find the element of causation and, consequently, that the trial court properly denied the appellant's JMOL motion. Tucson Heart suggests the jury received no evidence from which to draw a conclusion about causation in the absence of testimony from the on-call cardiologist, Dr. Byrne-Quinn, that he would have initiated the necessary interventions had he been alerted to Salica's deteriorating condition. But, as *Reinen* illustrates, testimony from this witness was not essential. The jury is not obligated to believe the testimony of a treating physician, and the testimony of qualified expert witnesses is sufficient to establish both a breach of the standard of care and causation. *See id*. ¶¶ 12-13. Furthermore, as the court noted here in denying the motion for JMOL, the evidence showed that a reasonably prudent cardiologist would have followed up with the necessary interventions promptly upon being informed of Salica's status, and "there was . . . testimony that a cardiothoracic surgeon was on call 24 hours a day and could have assembled a surgical team at any time during the nurse's night shift."

¶21 In the same vein, Tucson Heart contends evidence of causation was deficient because the plaintiff did not offer any specific proof that Nurse LeBlanc's failure to call a physician was a "necessary condition for the occurrence of the injury." It alternatively asserts that the plaintiff was required to prove "the injury would not have occurred without [Nurse LeBlanc's] act or omission." But as *Reinen* demonstrates, these

12

are not the applicable standards in medical malpractice cases where multiple actors contribute to an injury. Under such circumstances, a plaintiff is required to prove only that each defendant's conduct was a "'substantial factor'" in causing the injury. *See Ritchie v. Krasner*, 221 Ariz. 288, ¶¶ 9, 23, 211 P.3d 1272, 1279, 1281-82 (App. 2009), *quoting Wisener v. State*, 123 Ariz. 148, 150, 598 P.2d 511, 513 (1979).[8] "The plaintiff does not need 'to introduce evidence to establish that the negligence resulted in the injury or the death, but simply that the negligence increased the risk of injury or death.'" *Id.* ¶ 23, *quoting Thompson v. Sun City Cmty. Hosp., Inc.*, 141 Ariz. 597, 607, 688 P.2d 605, 615 (1984); *see generally* David A. Fischer, *Causation in Fact in Omission Cases*, 1992 Utah L. Rev. 1335, 1335-36, 1348 (1992) (explaining why problems of proof arising from tortious failures to act best resolved by substantial-factor test).

¶22 Tucson Heart further suggests the evidence was deficient because the plaintiff was required "to prove that Nurse LeBlanc's alleged breach of the standard of care proximately caused Mr. Salica's death, not just some alleged pre-death injury." When viewed as a whole, however, the expert testimony admitted below was sufficient to establish that LeBlanc's negligence substantially increased the likelihood of Salica's death. According to those experts, the delay caused by that negligence substantially compromised Salica's ability to endure and recover from surgery.

¶23 Although we find the evidence presented below sufficient to support a finding that Nurse LeBlanc's negligence was a proximate cause of Salica's death, to the

---

[8]This determination is informed by the considerations listed in Restatement § 433. *See Barrett*, 207 Ariz. 374, ¶ 24, 86 P.3d at 960-61.

extent the evidence of her causal role was unclear due to the acts of Dr. Myer and other physicians or staff treating Salica, the trial court did not err in denying the JMOL motion and submitting the case to the jury. Tucson Heart contends the "existence of multiple defendants has no impact on plaintiff's burden to prove causation." In light of *Holtz*, however, this is an incorrect statement of the law.

**¶24** In *Holtz*, our supreme court addressed the plaintiff's burden of proving causation "where [the] plaintiff is unable to prove which defendant caused which injuries or whether all were caused by one defendant or the other." 101 Ariz. at 249, 418 P.2d at 586. In such circumstances, the court reasoned that public policy favored adopting the so-called "'single injury' rule," thereby relaxing the plaintiff's burden of proof. *Id.* at 251, 418 P.2d at 588. The court observed that

> it is more desirable, as a matter of policy, for an injured and innocent plaintiff to recover his entire damages jointly and severally from independent tortfeasors, one of whom could have to pay more than his just share, than to let two or more wrongdoers escape liability altogether, simply because the plaintiff cannot carry the impossible burden of proving the respective shares of causation or because the tortfeasors have not committed a joint tort.

*Id.*

**¶25** Although joint and several liability subsequently was abrogated by A.R.S. § 12-2506, the rule from *Holtz* was reaffirmed in *Piner*. 192 Ariz. 182, ¶ 26, 962 P.2d at 915-16. After noting the interrelatedness of causation and apportionment of damages, *id.* ¶¶ 11-12, 18 & n.3, the *Piner* court held that, even under our present-day several-liability system, which calculates defendants' damages based on percentages of fault, a plaintiff

14

may recover as long as he or she shows defendants "contributed to the final result," in which case "the burden of proof on apportionment is on them." *Id.* ¶ 30. As these cases demonstrate, the but-for test for causation is not strictly applicable when causation cannot be determined between two defendants who may have created one injury. Otherwise, a plaintiff could not prove the element of causation, and therefore could not recover any damages, when the evidence failed to resolve whether one defendant caused all, or none, of the injuries. *See Summers*, 199 P.2d at 3-4.

**¶26** Tucson Heart also incorrectly suggests that apportionment of fault is wholly separate from the determination of causation. The rule in *Holtz*, which was developed from the Restatement § 433A, concerned the determination of both causation and damages. *Holtz*, 101 Ariz. at 251, 418 P.2d at 588. As our supreme court has noted, "'[t]he rules stated in §§ 430-453 [of the Restatement] as determining the causal relation necessary to liability are as fully applicable to establish the extent of liability as to establish its existence.'" *Thompson v. Better-Bilt Aluminum Prods. Co.*, 171 Ariz. 550, 554 n.5, 832 P.2d 203, 207 n.5 (1992), *quoting* Restatement (Second) of Torts § 454 (1965).

**Disposition**

**¶27** Finding no error, we affirm the trial court's ruling and the judgment entered against Tucson Heart.

/s/ *Peter J. Eckerstrom*

PETER J. ECKERSTROM, Presiding Judge

15

CONCURRING:

/s/ *J. William Brammer, Jr.*

J. WILLIAM BRAMMER, JR., Judge

/s/ *Garye L. Vásquez*

GARYE L. VÁSQUEZ, Judge