NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT
PRECEDENTIAL AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

JAMES A. WEBSTER, *Plaintiff/Appellant*,

*v.*

WINDSONG MEDICAL ASSOCIATES, P.L.C., a professional limited
liability corporation; YING WANG, M.D., *Defendants/Appellees*.

No. 1 CA-CV 15-0318
FILED 12-30-16

Appeal from the Superior Court in Yavapai County
No. P1300CV201101623
The Honorable Patricia A. Trebesch, Judge

**AFFIRMED IN PART; REVERSED IN PART; REMANDED**

COUNSEL

Law Office of Scott E. Boehm, P.C., Phoenix
By Scott E. Boehm
*Co-Counsel for Plaintiff/Appellant*

Lloyd Law Group, P.L.L.C., Payson
By Arthur E. Lloyd
*Co-Counsel for Plaintiff/Appellant*

Tolman Law Firm, Tempe
By J. Robert Tolman
*Co-Counsel for Plaintiff/Appellant*

Jones, Skelton & Hochuli, P.L.C., Phoenix
By Eileen Dennis GilBride, Stephen A. Bullington
*Counsel for Defendants/Appellees*

---

**MEMORANDUM DECISION**

Judge Peter B. Swann delivered the decision of the court, in which Presiding Judge Andrew W. Gould and Judge Patricia A. Orozco joined.

---

**S W A N N**, Judge:

**¶1**　　　　In this medical malpractice and wrongful death action the superior court, under Ariz. R. Civ. P. ("Rule") 50, granted partial judgment as a matter of law to the defendants in the midst of trial.  The court ruled that the plaintiff had failed to present sufficient evidence that any deviation from the standard of care after a certain date caused the decedent's death.  Because of the perceived lack of causation evidence, the court instructed the jury that it could not consider allegedly negligent acts committed after that date for *any* purpose.  The court also limited the plaintiff's ability to present evidence regarding the decedent's pain and suffering.

**¶2**　　　　We affirm the ruling regarding pain and suffering.  But we hold that the plaintiff did present sufficient expert testimony to allow a reasonable jury to infer that the decedent would not have died if her physician had complied with the standard of care after the cutoff date in the court's order.  And even in the absence of such causation testimony, we conclude that the court's actual instruction to the jury was more restrictive than its ruling under Rule 50 warranted — evidence of continuing conduct falling below the standard of care would have been relevant to the jury's consideration of *whether* there was negligence even if certain instances of deviations from the standard of care could not independently constitute a tort.  Because the court prevented the jury from considering the full measure of relevant evidence presented at trial, we reverse and remand.

**FACTS AND PROCEDURAL HISTORY**

**¶3**　　　　On August 22, 2010, Bettie Webster was hospitalized for a pulmonary embolism, and she was prescribed Coumadin, an anti-coagulation medication.  A few days into Bettie's hospital stay, Dr. Wang

2

assumed responsibility for her care. He discharged Bettie with instructions to continue Coumadin therapy and receive outpatient monitoring.

¶4 On September 17, 2010, Bettie saw Dr. Wang in his office. She complained of "redness on her right breast," swelling, and pain that she believed was the result of a bug bite. Dr. Wang examined Bettie and concluded that she had a bug bite.

¶5 On September 20, because Bettie's breast wound had gotten worse and she had a fever, Dr. Wang instructed her to go to the emergency room. There, she was treated for the wound by an emergency-room physician. That physician prescribed oral antibiotics and released her. Dr. Wang also saw Bettie in the emergency room that day.

¶6 On September 23, Bettie's home-health-care nurse noticed that Bettie was weak, her breast wound had increased in size, and she had blisters. The nurse, Dr. Wang, and poison control instructed Bettie to go to the emergency room, but she declined.

¶7 On September 24, Bettie was again admitted to the hospital. The next day, September 25, Dr. Wang discontinued the Coumadin because Bettie's blood chemistry was no longer within normal range. Bettie's breast wound and her bloodwork results thereafter improved. Dr. Wang then restarted Bettie on Coumadin on September 28, 2010. On September 29, Bettie developed a lesion on her thigh, at which point Dr. Wang began to suspect that she had Coumadin-induced skin necrosis ("CISN").

¶8 Bettie ultimately underwent a mastectomy related to the breast wound and skin debridement related to the thigh wound. She died on August 1, 2011. Her husband, James A. Webster, filed a medical malpractice and wrongful death action against Dr. Wang and Windsong Medical Associates, P.L.C.

¶9 At trial, Webster's standard-of-care expert, James Wilson, M.D., testified that Dr. Wang breached the standard of care by continuing the Coumadin administration on September 20 and 24, 2010. Dr. Wilson also testified that restarting Bettie on Coumadin on September 28 did not meet the standard of care:

> Q: On the 28th . . . Dr. Wang started Bettie back up on Coumadin. Do you have an opinion as to whether or not that conduct met the standard of care?

> A:     That did not meet the standard of care.
> Q:     And then the next day the thigh lesion appeared.
> A:     Yes.
> Q:     Do you have an opinion as to what caused the thigh lesion?
> A:     The Coumadin.

¶10          Webster's causation expert, David Talan, M.D., testified that Coumadin-induced necrosis may be slowed or stopped in its early stages but may cause irreversible tissue damage, and that Bettie's breast wound would likely necessitate a mastectomy by September 20, 2010.   He also testified that he, like Dr. Wilson, believed that Bettie's thigh wound was caused by the Coumadin.  He further testified that Bettie "ultimately died of complications that started and were directly related to her Coumadin-induced skin necrosis of her left hip."  He testified that he did not believe the thigh wound would have developed had the Coumadin been stopped on September 20, 2010, and not reintroduced:

> Q:     . . . If -- do you have an opinion, again, that you can express to a reasonable degree of medical probability if the Coumadin had been stopped on September 20, 2010, would the left hip lesion have ever developed?
> A:     And it wasn't reintroduced?
> Q:     Right.
> A:     No.  I don't think it would have developed.

¶11          After Webster rested his case, Wang moved for partial judgment as a matter of law under Rule 50, arguing that there was no causal link between Bettie's death and any alleged negligence occurring after September 20, 2010.  The court determined that Dr. Talan "indicat[ed] that as of September 20, 2010, there would have been damage no matter what," and that "the jury should not be allowed to speculate as to treatment offered after September 20th, 2010."   The superior court therefore granted the motion for judgment as a matter of law "with regard to the claims of negligence after 9/20/2010" and denied Webster's motion for reconsideration.  The court promptly informed the jury that "the Court has made a legal ruling that the only conduct by defendants you are to consider is conduct occurring on or before September 20, 2010."  The court reiterated in the final instructions that: "The only conduct by Ying Wang, M.D., now at issue is that which occurred on September 20, 2010.  In your deliberations you must not consider any conduct by Ying Wang, M.D., after September 20, 2010."

4

¶12      With respect to damages, the court ruled that Webster could not introduce testimony regarding Bettie's pain and suffering, which he had argued would demonstrate the harm that her statutory survivors incurred from observing her lingering death.  The court stated that it was "limiting the testimony" to "those elements resulting from [Bettie's] death, in other words, from the point of her death."  The court explained that though Webster "c[ould] elicit testimony regarding the relationship, the visits, the time spent[,] . . . . I don't think that any testimony with regard to medical procedures, changing dressings, anything like that, would be permissible from the family."

¶13      The jury returned a defense verdict.  Webster timely appeals.

## DISCUSSION

I.      THE SUPERIOR COURT ERRED BY GRANTING THE DEFENDANTS' RULE 50 MOTION BECAUSE DR. TALAN'S TESTIMONY SUPPORTS THE REASONABLE INFERENCE THAT BETTIE WOULD NOT HAVE DIED HAD DR. WANG DISCONTINUED COUMADIN CONSISTENT WITH THE STANDARD OF CARE AFTER SEPTEMBER 20, 2010.

¶14      Webster contends that the superior court erred by granting judgment as a matter of law as to any alleged negligence occurring after September 20, 2010, and that the jury was improperly instructed not to consider any such negligence.  We review de novo both the grant of judgment as a matter of law, and the question of whether a jury instruction correctly states the law.  *Glazer v. State*, 237 Ariz. 160, 167, ¶ 29 (2015); *A Tumbling-T Ranches v. Flood Control Dist. of Maricopa Cnty.*, 222 Ariz. 515, 533, ¶ 50 (App. 2009).

¶15      Rule 50 provides that "[i]f during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against the party."  Such relief should be granted when, taking the evidence in the light most favorable to the nonmovant, there is no issue of fact and the movant is entitled to relief as a matter of law.  *Monaco v. HealthPartners of S. Ariz.*, 196 Ariz. 299, 302, ¶ 6 (App. 1999); *Glazer*, 237 Ariz. at 167, ¶ 29.  Judgment as a matter of law is appropriate "only when the facts presented in support of a[n issue] have so little probative value that reasonable people could not find for the claimant."  *Monaco*, 196 Ariz. at 302, ¶ 6.

5

**¶16**      A medical-malpractice plaintiff must present evidence that the defendant failed to comply with the standard of care and that such failure was the proximate cause of harm to the plaintiff. A.R.S. § 12-563. With few exceptions not applicable here, the plaintiff must prove the standard of care deviation and causation by expert testimony. *Morell v. St. Luke's Med. Ctr.*, 27 Ariz. App. 486, 490 (1976); *Barrett v. Harris*, 207 Ariz. 374, 378, ¶ 12 (App. 2004). Causation is a question for the jury "unless reasonable persons could not conclude that a plaintiff had proved this element." *Barrett*, 207 Ariz. at 378, ¶12. A plaintiff "may prove proximate causation by presenting facts from which a causal relationship may be inferred, but the [plaintiff] cannot leave causation to the jury's speculation." *Salica v. Tucson Heart Hosp.-Carondelet, L.L.C.,* 224 Ariz. 414, 419, ¶ 16 (App. 2010).

**¶17**      Webster presented sufficient evidence that Dr. Wang's post-September 20 Coumadin decisions fell below the standard of care. Dr. Wilson specifically testified that Dr. Wang should have discontinued the medication on September 20 *and* 24, *and* should not have resumed it on September 28. Further, Webster presented sufficient evidence that Bettie died as a result of the thigh wound and that the thigh wound was caused by treatment she received *after* September 20: Dr. Talan testified that he did not believe the thigh wound would have developed if the Coumadin had been discontinued on September 20 "*[a]nd it wasn't reintroduced.*" (Emphasis added.) We cannot say that no reasonable person could infer from that statement that Bettie died as the result of Dr. Wang's post-September 20 decisions. The jury could reasonably have concluded from Dr. Talan's testimony that Bettie died because Coumadin was administered after September 20.[1]

**¶18**      Accordingly, the court erred by granting the defendants' motion for Rule 50 relief and by instructing the jury in accordance with that ruling. The issue of the defendants' liability for Dr. Wang's post-September 20 conduct should have been submitted to the jury.

**¶19**      We note also that the court's division of the tort of medical negligence into individual, daily events of liability (for which a deviation from the standard of care, or negligence, and causation must coincide) was

---

[1]      The defendants point out on appeal that before trial, the court precluded Dr. Talan from testifying about causation related to the Coumadin reintroduction because that opinion was late-disclosed. But the defendants did not object to the relevant testimony at trial.

not necessary as a matter of law. Rule 50 permits the court to determine whether there exists "legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Here, the "issue" was whether there was sufficient evidence that negligence committed after September 20 *caused* Bettie's death — not whether an overall pattern of negligence existed. Assuming that the court was correct concerning the absence of causation evidence, it should only have instructed the jury of that ruling. Even if the post-September 20 conduct could not be found to have caused Bettie's death, the conduct was relevant to the question of whether Dr. Wang's continuing decision to administer Coumadin (which began before September 20) constituted negligence. By instructing the jury that it could not consider conduct occurring after September 20 for any reason, the court (1) exceeded the grounds for its own ruling, (2) prevented the jury from considering the totality of the evidence bearing on standard of care, and (3) may have signaled to the jury (improperly) that no conduct after September 20 amounted to negligence at all. Because there was evidence that post-September 20 conduct violated the standard of care on a continuing basis, this instruction improperly invaded the province of the jury.

II.     THE SUPERIOR COURT DID NOT ABUSE ITS DISCRETION BY PRECLUDING EVIDENCE OF BETTIE'S PAIN AND SUFFERING.

**¶20**        Webster next contends that the superior court erred by precluding evidence of Bettie's pain and suffering. We review the court's evidentiary rulings for abuse of discretion. *Cal X-Tra v. W.V.S.V. Holdings, L.L.C.*, 229 Ariz. 377, 404, ¶ 89 (App. 2012).

**¶21**        Webster relies on *Girouard v. Skyline Steel, Inc.*, 215 Ariz. 126 (App. 2007), to argue that evidence regarding the "ten-month sequence of Bettie's demise" was admissible to show that her manner of death caused her survivors to suffer additional damages. *Girouard* recognized that "[f]rom the standpoint of the survivor who must be compensated for the harrowing experience of losing a loved one, death may not simply be the cessation of the decedent's life," but "may in fact encompass the scope of the manner in which the decedent's life ceased." *Id.* at 130, ¶ 16. But *Girouard* was expressly limited to anguish suffered as a result of "the manner of a decedent's death . . . as opposed to anguish caused by knowledge of premortem pain suffered by the decedent." *Id.* at 130-31, ¶ 17. *Girouard* explained:

> [C]ompensation in a wrongful death action is limited to "injury resulting from *the death*." A.R.S. 12-613 (emphasis supplied). Accordingly, . . . a survivor may not recover for

mental anguish resulting from the negligent acts of the defendant prior to the decedent's death . . . . Nor may a survivor recover for mental anguish resulting from actual or perceived pain and suffering experienced by the decedent during the time leading up to death because such period of time precedes the death of the decedent.

*Id.* at 132, ¶ 19. Under *Girouard*, we discern no abuse of discretion in the superior court's ruling limiting evidence regarding Bettie's pain and suffering to that related to her actual death, not her slow decline.

## CONCLUSION

**¶22** For the foregoing reasons, we affirm the superior court's ruling regarding the evidence of Bettie's pain and suffering, but we otherwise reverse. We remand for proceedings consistent with this decision.

